ALBERT L. EAST III AND ELLA M. EAST, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
East v. Commissioner
Docket No. 7616-88
United States Tax Court
T.C. Memo 1989-658; 1989 Tax Ct. Memo LEXIS 658; 58 T.C.M. (CCH) 953; T.C.M. (RIA) 89658; December 18, 1989
William S. Painter, Ernest G. Taylor, Jr., Alveno N. Castilla, and William B. Grete, for the petitioners. Helen C. T. Smith, for the respondent. *
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies of $ 38,376, $ 74,901, and $ 190,357 in petitioners' Federal income tax for 1981, 1982, and 1983, respectively. After concessions, the sole issue remaining for decision is whether *659 monthly payments made by Albert L. East III (petitioner) to his former wife Jean Ann Smith East (Jean East) are deductible alimony payments under section 215. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue. FINDINGS OF FACT Some of the facts have been stipulated, and the facts set forth in the stipulations are incorporated in our findings by this reference. Petitioners resided in Jackson, Mississippi, when they filed the petition in this case. Petitioner and Jean East were married to each other in 1950. From 1950 to 1954, petitioner was stationed at Keesler Air Force Base, Biloxi, Mississippi. In 1954, petitioner and Jean East moved to Louisiana and lived there until 1962. While in Louisiana, petitioner worked as a car salesman and acquired a small stock interest in his father's car dealership, Nelson and East Ford Company. After moving to Jackson, Mississippi in 1962, petitioner started East Ford, Inc. (East Ford), a Ford Motor Company car dealership. During the years in issue, petitioner was the president and sole stockholder of East Ford. In 1970, petitioner started Rebel Ford Trucks, *660 Inc. (Rebel Trucks), a Ford Motor Company truck dealership. From 1970 through August 1982, when the truck dealership went out of business, petitioner was an officer and stockholder of Rebel Truck. Jean East graduated from Louisiana State University and held a teacher's certificate. During her marriage to petitioner, Jean East was a full-time homemaker and mother. Jean East did not work in petitioner's automobile or truck businesses, nor was she otherwise gainfully employed at any time during the marriage. On October 23, 1977, petitioner and Jean East separated. At the time of their separation, petitioner and Jean East had three children who were all above the age of 21 years and were self-supporting. From October 1977 until March 1979, petitioner continued to provide support for Jean East. Petitioner deposited his monthly paycheck from East Ford into Jean East's checking account. During this period of time, petitioner's gross pay was $ 3,000 per month, and the net amount of his paycheck was approximately $ 2,500 per month. During their divorce proceedings, petitioner was represented by attorney Charles L. Howorth, Jr. (Howorth), and Jean East was represented by attorney *661 James Becker (Becker). Preliminary negotiations, however, were conducted by petitioner and Jean East. In October 1978, petitioner requested and received advice from his certified public accountant, Arthur W. Henderson (Henderson), regarding the tax implications of various means of providing for Jean East. Henderson advised petitioner of the estimated after-tax income that would be available to Jean East at various levels of monthly payments. Henderson's advice was based on the assumption that income tax on the monthly payments would be paid by Jean East. At the time Becker began negotiating on behalf of Jean East, petitioner had offered to pay to Jean East $ 4,000 per month alimony and had offered to transfer to her certain real property. Because petitioner and Jean East had been married for approximately 28 years and because petitioner had accumulated a substantial amount of property during their marriage, Becker believed that his client would be entitled to some share of petitioner's property. He did not, however, hire an appraiser or determine the value of Jean East's interest in petitioner's personal and business assets during the divorce settlement negotiations. Becker's *662 primary goal, in his own words, was "to be sure that [Jean East] would have an amount certain for the rest of her life." Because she had never worked, Jean East was concerned that she would not have any social security benefits. In order for her to retain life and health insurance benefits and earn social security credits, petitioner agreed that Jean East would be given an "employment contract" with East Ford. Pursuant to this "employment contract," Jean East was to be paid $ 1,000 per month and was to be entitled to participate in medical and life insurance plans available to the other employees of East Ford. Becker drafted a proposed alimony and property settlement agreement that he sent to Howorth and petitioner for review. Becker drafted the agreement so that the payments would not terminate on Jean East's remarriage or on petitioner's death. Becker believed that, under the laws of Mississippi in effect at the time, a property settlement could not be modified at a later date. To achieve the objective of nonmodifiability, Becker inserted into the draft agreement language that provided: That, as alimony and as further consideration for the settlement of the claim of *663 Wife to Husband's properties, and as a property interest, Husband agrees to pay unto Wife the sum of * * * $ 5,000, per month, * * * said payment not to terminate upon the death of Husband, but shall constitute a charge against his Estate until the death of Wife, irrespective of her possible remarriage. * * * [Emphasis supplied.] At Howorth's request, the language "and as a property interest" set forth in Becker's draft as consideration for the payments of $ 5,000 per month was deleted from the final agreement. Also at Howorth's request, the following language was inserted: Wife understands and agrees that the aforesaid monthly payment of $ 5,000.00 shall be the only claim she shall have against the estate of the Husband and that by her acceptance thereof and agreement hereto Wife expressly waives any and all further claim to Husband's estate. On February 21, 1979, petitioner and Jean East and their respective counsel executed an Alimony and Property Settlement Agreement (the Agreement), containing the following provisions: 1. (a) Husband and Wife jointly own a certain undeveloped lot located on Dauphin Island, Alabama, which lot shall be placed for sale and the balance *664 of sale proceeds shall be divided between the parties. That the parties also own jointly that certain land and property located at 1423 Roxbury Place, Jackson, Mississippi, and a house and lot located on Dauphin Island, Alabama. That in consideration of the transfer by Husband to Wife by Quitclaim Deed of his right, title and interest in and to the aforesaid two properties, with Wife assuming all balance of indebtedness thereon, Wife shall release Husband from any and all other known and unknown interests and claims that she may have acquired in the businesses, properties, and all assets developed by Husband during their marriage. * * * 2. That, as alimony and as further consideration for the settlement of the claim of Wife to Husband's properties, Husband agrees to pay unto Wife the sum of Five Thousand and NO/100 Dollars, ($ 5,000.00), per month, payable on the fourth day of each and every month hereafter, said payment not to terminate upon the death of Husband, but shall constitute a charge against his Estate until the death of Wife, irrespective of her possible remarriage. It is the full intention of Husband that Wife shall receive as alimony and as a property settlement *665 from him or his Estate the sum of Five Thousand and NO/100 Dollars, ($ 5,000.00), for each and every month hereafter until her death. Wife understands and agrees the aforesaid monthly payment of $ 5,000.00 shall be the only claim she shall have against the estates of the Husband and that by her acceptance thereof and agreement hereto Wife expressly waives any and all further claim to Husband's Estate. That incident to the further support of Wife, she shall be granted an employment contract with East Ford, Inc., for public relations and other services to be performed by Wife, whereupon her salary shall be One Thousand and NO/100 Dollars ($ 1,000), per month, and Wife shall remain on all profit sharing and/or insurance benefit plans for medical, life or other insurance available to other employees, and all of the premiums therefor shall be paid by East Ford, Inc. * * * The Agreement did not specify an aggregate, fixed sum to be paid to Jean East and did not specify any security for the monthly payments. As of the date the Agreement was executed, petitioner believed that his net worth was $ 4,481,852. The parties to the Agreement believed that the properties transferred *666 to Jean East under the Agreement had the following values: Personal residence
$ 175,000 Summer home
150,000 Furnishings
130,000 Half interest in
vacant lot
25,000 Less debt assumed
(30,000)
Total
$ 450,000 At the time he executed the Agreement, petitioner intended to support his former wife for the rest of her life. It was petitioner's objective to provide Jean East with after-tax support payments of approximately $ 3,000 per month, an amount equal to her normal monthly living expenses. Petitioner also intended that the settlement allow his former wife to maintain the lifestyle that she had enjoyed during their marriage. Howorth believed that the proposed agreement was structured so that paragraph 1 would provide for a property settlement and paragraph 2 would provide for support payments. Howorth intended that the proposed periodic payments from petitioner to Jean East constitute alimony. Petitioner believed and intended that the periodic payments would be treated as alimony taxable to Jean East. Jean East and Becker received advice from her certified public accountant, Eddie DeMiller (DeMiller), regarding the tax *667 implications of the Agreement. DeMiller concluded that the transfer of real property from petitioner to Jean East would not be taxable while "the alimony of $ 5,000 a month payable by Albert L. East to his wife, Jean Ann Smith East, will represent income taxable to Mrs. East as ordinary income, and will be deductible alimony payments by Mr. East for both the federal and state of Mississippi income tax returns." Notwithstanding this advice, Becker believed that his drafted language left some question as to the taxable nature of the payments. On March 28, 1979, petitioner and Jean East were divorced by final decree in the Hinds County, Mississippi, Chancery Court on the grounds of irreconcilable differences. The Agreement was attached to and incorporated as Exhibit A in the divorce decree, and the parties were ordered to abide by its terms. At the time of their divorce, petitioner was approximately 51 years old and Jean East was approximately 49 years old. Petitioner paid Jean East $ 5,000 per month for a total of $ 60,000 per year in 1981 and 1982. Petitioner deducted the monthly payments at issue on his Federal income tax returns for the years in issue. Jean East reported *668 the monthly payments received in 1979, 1980, and 1981 as alimony on her original Federal income tax returns and accordingly included the payments in her adjusted gross income for those years. Beginning in 1981, petitioner's car and truck dealerships began experiencing financial difficulties. Petitioner contacted Jean East and asked her to accept reduced monthly payments until his businesses became more profitable. Jean East refused petitioner's request. Subsequently, petitioner hired an attorney to represent him in attempting to reduce his monthly payments to Jean East. On August 9, 1982, petitioner filed a complaint to modify the final decree of divorce. On August 26, 1983, the Hinds County Chancery Court issued its opinion in response to petitioner's complaint to modify the divorce decree, reducing the monthly payments to $ 4,000 per month and assessing the court costs to Jean East. Thereafter, on October 31, 1983, the chancery court entered its Judgment of Modification which incorporated by reference its prior opinion. In modifying the divorce decree, the court specifically found that the monthly payments were alimony payments and ruled that the payments of $ 5,000 per *669 month should be reduced to $ 4,000 per month. Jean East appealed the Judgment of Modification reducing the monthly payments petitioner was obligated to make. Petitioner paid Jean East $ 56,000 in 1983. During 1983, petitioner paid Jean East $ 5,000 per month for the first 8 months of the year. Pursuant to the chancery court's modification of the divorce decree, petitioner paid Jean East $ 4,000 per month beginning in September 1983 and continuing for the remainder of that year. In July 1983, Jean East filed amended Federal income tax returns for 1979, 1980, and 1981 and reported the monthly payments at issue as property settlement payments rather than alimony. Subsequently, as a result of these amended returns, respondent approved Jean East's claims for refunds of income taxes paid for 1979, 1980, and 1981. On her Federal income tax returns for 1982 and 1983, Jean East did not report as alimony or include in adjusted gross income any of the monthly payments received from petitioner during those years. Respondent did not issue statutory notices of deficiency to Jean East with respect to the payments at issue, nor did respondent take any other action to extend the statutory *670 period for assessment of deficiencies in tax against Jean East for 1979, 1980, or 1981. The period of limitations for such assessments expired prior to the events described below. On August 13, 1986, the Supreme Court of Mississippi issued its opinion on Jean East's appeal of the chancery court's order. The Supreme Court held that the Agreement was nonmodifiable and reversed the chancery court. Respondent determined that the payments made by petitioner to Jean East in 1981, 1982, and 1983 were property settlement payments that do not qualify as alimony and, therefore, are not deductible from gross income. OPINION For reasons indicated in our findings, no notice of deficiency was sent to petitioner's former wife, Jean East. She was, however, permitted to file an amicus curiae brief in this case. Jean East (amicus) and respondent make similar arguments and are essentially in agreement. Amicus, petitioner, and respondent all analyze the facts in relation to the factors set forth in Beard v. Commissioner, 77 T.C. 1275 (1981), as indicative of whether payments from one spouse to another represent deductible alimony or nondeductible payments for property. We *671 agree that the Beard analysis is appropriate, and we discuss below the seven factors in that analysis. Before addressing the issue, however, we must comment on what is not an issue. This is not a case in which we decide whether Jean East received what she was entitled to under the settlement agreement entered into with petitioner. The issue before us is the intent of the parties at the time they entered into the Agreement, regardless of the fairness of the Agreement, the appropriateness of petitioner's subsequent attempt to modify the Agreement, and the bar of the statute of limitations with respect to any deficiency of Jean East for the years in issue. We have not given weight to any event subsequent to the settlement agreement other than the opinion of the Mississippi Supreme Court. Specifically, for example, we are ignoring the improper attachment to amicus' brief, consisting of a copy of a brief filed on her behalf in the Mississippi Supreme Court. Cf. Snyder v. Commissioner, 93 T.C. (filed November 2, 1989). The Mississippi Supreme Court Opinion
In East v. East, 493 So.2d 927 (Miss. 1986), the Mississippi Supreme Court stated in pertinent *672 part: It was clearly the intent of these parties, each represented by eminent legal counsel, to affix unalterably their mutual responsibilities for the remainder of their lives. Moreover, their agreement was approved by the chancellor and made a part of the divorce decree. It was the obvious intent of the parties to create a non-modifiable agreement, and of the chancery court to approve and confirm it as part of a solemn court decree. The parties and the chancery judge intended to create a non-modifiable contract and court judgment. If we hold this agreement solemnized by court decree could be modified by subsequent change in circumstances of the parties, then we must also say it is impossible to draft an agreement to pay the wife a sum certain until she dies which cannot be changed, up or down. This case presents a troublesome question. Parties divorce, and as part of the decree the husband obligates himself to make future payments to his wife. Subsequent events make one or the other unhappy with the trade, and a petition is filed for modification of the final decree. [493 So.2d at 930.] Citing various Mississippi authorities, the court went on to *673 explain that periodic alimony is subject to change by a court and ceases upon remarriage or death of the party entitled to receive it. The opinion continued: The parties cannot by contract deprive, and it is doubtful if any court has the authority to deprive itself of the future authority to modify ordinary periodic alimony, or make it continue beyond the remarriage of the wife or the death of the husband. * * *. [2]
*674 On the other hand we have historically recognized that alimony awarded in a lump sum, or in gross constitutes a fixed liability of the husband and his estate and cannot be modified. * * * and, so long as the decree is unambiguous that the alimony is in lump sum, or in gross, it can provide for payment in fixed, periodic installments. * * * A divorce decree may embody periodic as well as lump sum alimony. * * * Lump sum alimony in a decree may very well have some of the attributes of a property settlement. It may be given to a wife who has by her efforts in her husband's behalf enabled him to accumulate considerable wealth, and even though she might not be entitled to any periodic alimony. * * * It may be awarded to a wife who over the years has assisted her husband in accumulating considerable property by doing her part as a housewife. * * * We have also historically recognized that parties may upon *675 dissolution of their marriage have a property settlement incorporated in the divorce decree, and such property settlement is not subject to modification. A true and genuine property settlement agreement is no different from any other contract, and the mere fact that it is between a husband and wife, and incorporated in a divorce decree, does not change its character. * * * [493 So.2d at 931; citations omitted.] After noting the 1976 statutory change that authorized the divorce on grounds of irreconcilable differences, the Mississippi Supreme Court phrased the question before it as follows: Was the $ 5,000 monthly payment merely periodic alimony, or a form of lump sum alimony payable in fixed immutable installments until her death, or a property settlement? [493 So.2d at 932.] The opinion concluded: We find that the agreement between Mr. and Mrs. East, while using the term alimony, was in fact a property settlement or lump sum alimony, payable in fixed, unalterable installments. When the parties specifically provided in their agreement as part and parcel of their property settlement that the payments would not terminate upon either *676 his death or her remarriage, and she could never ask that any of these payments be increased, which was approved by the court in the divorce decree, this removed any claim that it was no more than periodic alimony. Mr. and Mrs. East are bound by its terms and provisions. * * * [493 So.2d at 932.] Petitioner contends that the Mississippi Supreme Court opinion does not discuss or ascertain the intent of the parties regarding the purpose of the payments, only their intention to create a nonmodifiable agreement. Respondent argues that "The Mississippi Supreme Court's interpretation proves that the agreement is highly ambiguous. The Court's interpretation is entitled to consideration and to deference by the Tax Court. * * * the Mississippi Supreme Court ruling does have significant relevance to the Tax Court's decision." Respondent does not, however, indicate how the opinion of the Mississippi Supreme Court is helpful or supports the argument that the payments should be determined, for Federal tax purposes, to be property settlement rather than deductible alimony. Amicus argues that the Mississippi Supreme Court "clearly held that the Death Terminating Payments were *677 not payments arising from Petitioner's obligation to support Amicus." The opinion of the Mississippi Supreme Court, however, "clearly" allows for categorization of payments as lump sum alimony, having only "some of the attributes of a property settlement" -- notably nonmodifiability. The deductibility of the payments in issue here is determined under Federal law, and our independent consideration of the relevant factors raises no inference with respect to our view of application of Mississippi law to the issue of nonmodifiability. The opinion of the Mississippi Supreme Court simply does not address the factors that are relevant and determinative in this case. Property Division or Support
To be characterized as alimony deductible by petitioner and taxable to amicus, the payments in question must be made in discharge of a legal obligation imposed because of the marital or family relationship, i.e., payments for support and not for the purpose of dividing marital assets. Sections 71(a) and 215; Beard v. Commissioner, supra. Case law has developed *678 seven factors that indicate that payments by one spouse to another are in the nature of a property settlement rather than a support allowance. No single factor is conclusive, but the absence of one or more may tend to indicate that the payments are in the nature of a support allowance. Those factors are that (1) the parties in their agreement (or the court in its decree) intended the payments to effect a division of their assets; (2) the recipient surrendered valuable property rights in exchange for the payments; (3) the payments are fixed in amount and not subject to contingencies, such as death or remarriage; (4) the payments are secured; (5) the amount of the payments and other property awarded to the recipient approximates one-half of the property accumulated by the parties during the marriage; (6) the need of the recipient was not taken into consideration in determining the amount of the payments; and (7) a separate provision for support was provided elsewhere in the agreement. Beard v. Commissioner, 77 T.C. at 1284-1285. A review of these factors does not favor the position of respondent or amicus. An inference *679 as to intent of the parties to the Agreement in this case necessarily draws on the same evidence as that discussed under other factors, and there is some overlap. As the Mississippi Supreme Court stated in its opinion in East v. East, however, a prime indicator of intent, particularly where both parties to an agreement are represented by competent counsel, is the specific language of the agreement. In paragraph 1 of the Agreement here, amicus released her property rights in exchange for specific items of real property. In paragraph 2 "as alimony and as further consideration for the settlement of the claim of Wife to Husband's properties," petitioner agreed to pay to amicus $ 5,000 per month. The language in paragraph 2 was explained by the testimony at trial, specifically by the testimony of Becker, as a deliberate attempt to make the Agreement nonmodifiable with respect to the $ 5,000 per month payments. That attempt was successful. There is no testimony that the $ 5,000 per month payments were intended to constitute payments for property interests, and the evidence is to the contrary, as discussed further below. The Agreement between petitioner and amicus, by its terms, *680 resolves claims to alimony and to property. Thus all consideration paid by petitioner to amicus can be considered payment for surrender of her rights to each category. The language inserted in the Agreement at Howorth's request is consistent with this interpretation. We cannot, on the evidence in this case, conclude that the $ 5,000 per month payments were intended to be solely or primarily for property rights. Apparently amicus had claims to property held in the name of petitioner as well as to property that was jointly owned. Certainly she had claims to substantial alimony under Mississippi law in view of the length of the marriage, the disparity between earning abilities of the parties to the Agreement, and the standard of living to which she had become accustomed. See Brabham v. Brabham, 226 Miss. 165, 84 So.2d 147 (1955). So far as we can determine from the evidence, amicus' rights to alimony were far clearer than her claims to property. The parties to the Agreement, and specifically counsel for petitioner's former wife, did not determine the value of her property rights before entering into the Agreement; the chancery court did not determine those values; *681 the Mississippi Supreme Court did not determine those values; and we have insufficient objective evidence from which to determine those values. The parties have merely estimated that petitioner's net worth was approximately $ 4.5 million and the property received by amicus was worth approximately $ 450,000. We cannot conclude that payments of $ 5,000 per month for the rest of the life of amicus, who was under 50 at the time, constituted payment for an undetermined amount of property. The payments in question were to terminate on the death of amicus but not on her remarriage. To the extent that the payments terminate on the death of amicus, this factor suggests that the payments are alimony. In view of the length of the marriage and the status of the parties, the provision that payments continue even in the event of remarriage is not persuasive, particularly because it was not given conclusive effect by the Mississippi Supreme Court. See Phinney v. Mauk, 411 F.2d 1196, 1198 (5th Cir. 1969). Addressing the absence of security for the payments, respondent argues that no *682 security was necessary because of petitioner's substantial wealth. The significance of security, however, is not related to the payor's ability to make the payments in question. Security is a factor in cases where there is a specific lien on the property, because the presence of a lien suggests that the payment is made for the property. See, e.g., Widmer v. Commissioner, 75 T.C. 405, 409 (1980). As indicated above, the total value of the property accumulated by the parties during the marriage has only been estimated, was not determined by the parties prior to the Agreement, and was not determined by the Mississippi Supreme Court. Thus, we cannot determine with any certainty whether the amount of the payments plus the other property awarded to amicus equals approximately one-half of the property accumulated by the parties during marriage. The evidence in the record, however, precludes a conclusion that the need of amicus was not taken into consideration in determining the amount of the payments. Compare McCombs v. Commissioner, 397 F.2d 4, 7 (10th Cir. 1968), affg. a Memorandum Opinion of this Court. Respondent acknowledges that, at the *683 time of the divorce, petitioner was giving amicus between $ 2,250 and $ 2,500 per month, and petitioner's accountant prepared computations that showed the after-tax effect of payments at particular levels. These computations corroborate petitioner's testimony that his intention was to provide the same level of support to amicus after the divorce as before, on the assumption that income tax on the payments would be paid by her. Although there is no evidence of what the actual needs of amicus were at the time of the divorce or were expected to be for the duration of her life, her estimated or assumed needs were apparently given much greater consideration than her actual interests in property. Becker testified that his primary interest was in securing a regular income for amicus that petitioner could not reduce or change. He testified in response to questions from respondent's counsel as follows: Q Who actually drafted the first version of that agreement before it was -- the ultimate version was finally adopted? A That is my language. Q Okay. And did you have any specific objectives for your client, Jean East, when you drafted that agreement? A Well, during the time we were *684 negotiating, she wanted to be taken care of for the rest of her life. Al had a -- what we thought was property where he had the dealership -- one or both of them, I am not certain without studying real closely here -- that was worth about -- we figured about $ 650,000. And there was a discussion at one time whether he would convey those properties to her, so that she would have ample support for the rest of her life. And then during the negotiations, after I sent him my accountant's request for appraisals and income statements, profit and loss sheets, et cetera, I was advised he didn't want to consider a property transfer anymore. And so we went on into the idea that she would get this alimony, and we called it "and as a property settlement," and I phrased it that way because, in my opinion, a property settlement was not able to be changed or modified under the Court's -- Mississippi Supreme Court rulings that were in effect at that time, and I wanted to be sure that she would have an amount certain for the rest of her life. I also thought there may have been a question as to the taxable nature of it, and that that would give her a good call on it not being taxable. My accountant *685 did not agree with that, but I felt like it was a good chance of that. Q So what specifically did you do in terms of specific language in the agreement to achieve those objectives for your client, if you can recall? A Well, of course he conveyed the home and the Dauphin Island property to her. And then we put in this paragraph 2 that is on page 3 of the agreement, and this is my language, "that as alimony and as further consideration for the settlement of the claim of wife to husband's property, husband agrees to pay unto wife the sum of $ 5,000 per month, said payment not to terminate upon the death of husband, but shall constitute a charge against his estate until the death of wife, irrespective of her possible remarriage." Now that is my language. I also wrote the rest of that paragraph. I think I even had it a little stronger at one time, but Charlie Howorth objected to one phrase in that first portion of the paragraph. If it had been just normal alimony, as a lot of times you have, it would have terminated upon her death or remarriage, and it of course would have terminated upon his death. But I wanted it particularly binding, so it did not terminate on his death or *686 her remarriage. And I provided that it would be a charge on his estate. I have never had anybody else sign that before. Q How did the parties arrive at the amounts of $ 5,000 per month from Mr. East and $ 1,000 per month from East Ford? A Well, as I recall, and it has been ten years, the $ 5,000 a month was what Jean said she wanted every month. And that was geared to this absolutely non-negotiable, non-modifiable language. The $ 1,000 a month, as I recall, was to keep her on the payroll at East Ford, so she could be eligible for the benefits and stay on the program for the hospitalization and such as that. Q Can you tell us, if you know, why the $ 5,000 a month payments were contingent only on her life, and the $ 1,000 payments were contingent on her staying unmarried? A Well, even though -- I can't give you a clear answer on that. I just don't recall. I did want the $ 5,000 a month to continue throughout the rest of her life, whether Al predeceased her. Q When you negotiated the agreement and when you drafted it, what did you consider the $ 5,000 a month payment was: alimony which would be deductible to Mr. East and income to her, or property settlement? A It is *687 really sort of a hybrid, I believe. But it definitely was taken in lieu of him transferring enough security that she could have been taken care of out of the income of that security for the rest of her life. Obviously Becker's objective related to the needs of amicus. Further, he abandoned any effort to secure reliable information about the value of petitioner's property. Petitioner's testimony and Becker's testimony persuade us that the foremost, if not only, consideration in setting the $ 5,000 per month payments was the need of amicus. Under all of the circumstances, it is extremely unlikely that the sum of $ 1,000 per month, to be paid by the auto dealership, was a separate provision for the support of amicus and was all that was allocable to support. We need not draw any inference as to the reason why the $ 1,000 payments per month were to be made from the corporation. It is probable that the payments supported maintenance of social security coverage and insurance on amicus, as suggested by petitioner and Becker, and thus logically terminated upon remarriage. There is no logical relationship between the amount of these payments, however, and the amount of support to *688 which amicus was entitled. No party suggests that she was entitled to support of only $ 1,000 per month. Respondent suggests that, if we do not accept his argument that the $ 5,000 per month payments were property settlement, we determine that some part of those payments is allocable to property rights. The record does not support any allocation other than the one made by the parties at the time of the divorce. We are persuaded on the evidence that the Agreement of the parties in form and in substance specifies that $ 5,000 per month was to be alimony. Respondent suggests that we should draw a negative inference from the failure of petitioner to call amicus as a witness. Respondent's trial memorandum, not petitioner's, listed amicus as a probable witness. Obviously amicus would be a hostile witness with an adverse interest if called by petitioner. If any inference is to be drawn, it is to respondent's detriment. Decision will be entered for the petitioners. Footnotes
*. An amicus curiae brief was filed on behalf of Jean S. East Burrow by Steven I. Klein and Daniel J. Daigle.↩
2. The reason for this lack of power is encompassed in the meaning we have placed upon "periodic alimony." "Alimony" thus defined comes from the duty of the husband to support his wife. * * * If, as we have consistently stated such alimony is imposed on a husband to support his former wife in the manner to which she has been accustomed to the extent of his ability to pay, * * * then it is nonsensical to state in the divorce decree that the alimony payments cannot be changed, regardless of future circumstances of the parties. [Citations omitted.] The problem arises when one judge thinks alimony means "X," another thinks it means "Y," and an appellate court thinks it means "XY."↩